**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**

|  |  |
|---|---|
| PATRICIA BURNELLE, on behalf of herself and all others similarly situated, | Case No.:  0:24-cv-00972-MGL |
| Plaintiff, | **CLASS ACTION** |
| | **DEMAND FOR A JURY TRIAL** |
| v. | |
| SAGE HOME LOANS CORPORATION f/k/a LENOX FINANCIAL MORTGAGE CORPORATION d/b/a WESLEND FINANCIAL, | |
| Defendant. | |

Plaintiff Patricia Burnelle ("Plaintiff") brings this Class Action Complaint ("Complaint") against Sage Home Loans Corporation f/k/a Lenox Financial Mortgage Corporation d/b/a Weslend Financial ("Sage" or "Defendant") as an individual and on behalf of all others similarly situated, and alleges, upon personal knowledge as to her own actions and her counsels' investigation, and upon information and belief as to all other matters, as follows:

## SUMMARY OF ACTION

1.      Plaintiff brings this class action against Defendant for its failure to properly secure and safeguard personal identifiable information ("PII") of its customers, including, but not limited to: their first and last names, dates of birth, passport numbers, driver's license numbers, federal/state identification card numbers, tax identification numbers, Social Security and/or financial account information, phone numbers, addresses, and email addresses.

2.      Defendant is a corporation that provides home loans, mortgages, and other financing services to its customers.

3.      Plaintiff's and Class Members' sensitive personal information—which they entrusted to Defendant on the mutual understanding that Defendant would protect it against disclosure—was compromised and unlawfully accessed due to the Data Breach.

4.      Sage collected and maintained certain personally identifiable information of Plaintiff and the putative Class Members (defined below), who are (or were) customers at Defendant.

5.      The PII compromised in the Data Breach was exfiltrated by cyber-criminals and remains in the hands of those cyber-criminals who target PII for its value to identity thieves.

6.      As a result of the Data Breach, Plaintiff and Class Members suffered concrete injuries in fact including, but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

7.      The Data Breach was a direct result of Defendant's failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect consumers' PII from a foreseeable and preventable cyber-attack.

8.      Defendant maintained, used, and shared the PII in a reckless manner. In particular, the PII was used and transmitted by Defendant in a condition vulnerable to cyberattacks. Upon

information and belief, the mechanism of the cyberattack and potential for improper disclosure of Plaintiff's and Class Members' PII was a known risk to Defendant, and thus, Defendant was on notice that failing to take steps necessary to secure the PII from those risks left that property in a dangerous condition.

9.      Defendant disregarded the rights of Plaintiff and Class Members by, *inter alia*, intentionally, willfully, recklessly, or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to take standard and reasonably available steps to prevent the Data Breach; and failing to provide Plaintiff and Class Members prompt and accurate notice of the Data Breach.

10.     Plaintiff's and Class Members' identities are now at risk because of Defendant's negligent conduct because the PII that Defendant collected and maintained is now in the hands of data thieves.

11.     Armed with the PII accessed in the Data Breach, data thieves have already engaged in identity theft and fraud and can in the future commit a variety of crimes including, *e.g.*, opening new financial accounts in Class Members' names, taking out loans in Class Members' names, using Class Members' information to obtain government benefits, filing fraudulent tax returns using Class Members' information, obtaining driver's licenses in Class Members' names but with another person's photograph, and giving false information to police during an arrest.

12.     As a result of the Data Breach, Plaintiff and Class Members have been exposed to a heightened and imminent risk of fraud and identity theft. Plaintiff and Class Members must now and in the future closely monitor their financial accounts to guard against identity theft.

13. Plaintiff and Class Members may also incur out of pocket costs, *e.g.*, for purchasing credit monitoring services, credit freezes, credit reports, or other protective measures to deter and detect identity theft.

14. Plaintiff brings this class action lawsuit on behalf all those similarly situated to address Defendant's inadequate safeguarding of Class Members' PII that it collected and maintained, and for failing to provide timely and adequate notice to Plaintiff and other Class Members that their information had been subject to the unauthorized access by an unknown third party and precisely what specific type of information was accessed.

15. Through this Complaint, Plaintiff seeks to remedy these harms on behalf of herself and all similarly situated individuals whose PII was accessed during the Data Breach.

16. Plaintiff and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

## JURISDICTION AND VENUE

17. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class, including Plaintiff, is a citizen of a state different from Defendant.

18. This Court has personal jurisdiction over Defendant because its principal place of business is in this District and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

19.     Venue is proper under 18 U.S.C § 1391(b)(1) because Defendant's principal place of business is in this District and the acts and omissions giving rise to Plaintiff's claims occurred in and emanated from this District.

## PARTIES

20.     Plaintiff Patricia Burnelle is a resident and citizen of Georgetown, Massachusetts.

21.     Defendant is a corporation organized under the state laws of California with its principal place of business located in Fort Mill, South Carolina.

## FACTUAL ALLEGATIONS

### *Defendant's Business*

22.     Defendant is a corporation that provides home loans, mortgages, and other financing services to its customers.

23.     Plaintiff and Class Members are current and former customers of Defendant.

24.     In the course of their relationship, customers, including Plaintiff and Class Members, provided Defendant with at least the following: names, dates of birth, contact information, and Social Security numbers.

25.     Upon information and belief, in the course of collecting PII from customers, including Plaintiff, Defendant promised to provide confidentiality and adequate security for the data it collected from customers through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

26.     Indeed, Defendant provides on its website that:

We take the protection of your data very seriously.

We use best practices to help keep your data safe.[1]

---

[1] https://www.sagehomeloans.com/privacy

27.     Plaintiff and the Class Members, as customers of Defendant, relied on these promises and on this sophisticated business entity to keep their sensitive PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information. Consumers, in general, demand security to safeguard their PII, especially when their Social Security numbers and other sensitive PII is involved.

*The Data Breach*

28.     On or about February 2, 2024, Defendant began sending Plaintiff and other Data Breach victims a Notice of Security Incident letter (the "Notice Letter"), informing them that:

> **What Happened?** On December 19, 2023, unusual network activity consistent with a ransomware attack was discovered on Lenox servers. Lenox immediately took steps to secure its network and initiated an investigation with the assistance of cybersecurity experts. The investigation revealed that an unauthorized actor gained access to the Lenox network on December 5, 2023, and obtained certain data from the network on or about December 19, 2023. Lenox promptly began a review of potentially affected files to determine what information may have been involved in this incident

> **What Information Was Involved?** The personal information involved may have included your name, date of birth, passport number, drivers license number, federal/state identification card number, tax identification number, social security and/or financial account information, and other information such as phone number, address, and email address.[2]

29.     Omitted from the Notice Letter were the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these omitted details have not been explained or clarified to Plaintiff and Class Members, who retain a vested interest in ensuring that their PII remains protected.

30.     This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiff and Class Members of the Data Breach's critical facts. Without

---

[2]     The "Notice Letter". A sample copy is available at https://oag.ca.gov/ecrime/databreach/reports/sb24-580472

these details, Plaintiff's and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

31.    Defendant had obligations created by the FTC Act, the Gramm-Leach-Bliley Act, contract, common law, and industry standards to keep Plaintiff's and Class Members' PII confidential and to protect it from unauthorized access and disclosure.

32.    Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed.

33.    The attacker accessed and acquired files Defendant shared with a third party containing unencrypted PII of Plaintiff and Class Members. Plaintiff's and Class Members' PII was accessed and stolen in the Data Breach.

34.    Plaintiff further believes that her PII and that of and Class Members was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

***Data Breaches Are Preventable***

35.    Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiff and Class Members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed.

36.    Defendant could have prevented this Data Breach by, among other things, properly encrypting or otherwise protecting their equipment and computer files containing PII.

37.    A ransomware attack is a type of cyberattack that is frequently used to target healthcare providers due to the sensitive patient data they maintain.[3] In a ransomware attack the attackers use software to encrypt data on a compromised network, rendering it unusable and demanding payment to restore control over the network.[4] Ransomware attacks are particularly harmful for patients and healthcare providers alike as they cause operational disruptions that result in lengthier patient stays, delayed procedures or test results, increased complications from surgery, and even increased mortality rates.[5] In 2021, 44% of healthcare providers who experienced a ransomware attack saw their operations disrupted for up to a week and 25% experienced disrupted services for up to a month.[6]

38.    Companies should treat ransomware attacks as any other data breach incident because ransomware attacks don't just hold networks hostage, "ransomware groups sell stolen data in cybercriminal forums and dark web marketplaces for additional revenue."[7]  As cybersecurity expert Emisoft warns, "[a]n absence of evidence of exfiltration should not be construed to be evidence of its absence […] the initial assumption should be that data may have been exfiltrated."

39.    An increasingly prevalent form of ransomware attack is the "encryption+exfiltration" attack in which the attacker encrypts a network and exfiltrates the data

---

[3] *Ransomware warning: Now attacks are stealing data as well as encrypting it*, available at https://www.zdnet.com/article/ransomware-warning-now-attacks-are-stealing-data-as-well-as-encrypting-it/
[4] *Ransomware FAQs*, available at https://www.cisa.gov/stopransomware/ransomware-faqs
[5] *Ponemon study finds link between ransomware, increased mortality rate*, available at https://www.healthcareitnews.com/news/ponemon-study-finds-link-between-ransomware-increased-mortality-rate
[6] *The State of Ransomware in Healthcare 2022*, available at https://assets.sophos.com/X24WTUEQ/at/4wxp262kpf84t3bxf32wrctm/sophos-state-of-ransomware-healthcare-2022-wp.pdf
[7] *Ransomware: The Data Exfiltration and Double Extortion Trends*, available at https://www.cisecurity.org/insights/blog/ransomware-the-data-exfiltration-and-double-extortion-trends

contained within.[8]  In 2020, over 50% of ransomware attackers exfiltrated data from a network before encrypting it.[9] Once the data is exfiltrated from a network, its confidential nature is destroyed and it should be "assume[d] it will be traded to other threat actors, sold, or held for a second/future extortion attempt."[10]  And even where companies pay for the return of data attackers often leak or sell the data regardless because there is no way to verify copies of the data are destroyed.[11]

40.     As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[12]

41.     To prevent and detect cyber-attacks and/or ransomware attacks Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

---

[8] *The chance of data being stolen in a ransomware attack is greater than one in ten*, available at https://blog.emsisoft.com/en/36569/the-chance-of-data-being-stolen-in-a-ransomware-attack-is-greater-than-one-in-ten/

[9] 2020 Ransomware Marketplace Report, available at https://www.coveware.com/blog/q3-2020-ransomware-marketplace-report

[10] *Id*.

[11] *Id*.

[12] How to Protect Your Networks from RANSOMWARE, at 3, *available at:* https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[13]

42.     To prevent and detect cyber-attacks or ransomware attacks, Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

---

[13] *Id.* at 3-4.

**Thoroughly investigate and remediate alerts**

-    Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

-    Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

-    Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

-    Monitor for adversarial activities
-    Hunt for brute force attempts
-    Monitor for cleanup of Event Logs
-    Analyze logon events;

**Harden infrastructure**

-    Use Windows Defender Firewall
-    Enable tamper protection
-    Enable cloud-delivered protection
-    Turn on attack surface reduction rules and [Antimalware Scan  Interface] for Office [Visual Basic for Applications].[14]

43.    Given that Defendant was storing the PII of its current and former customers, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

44.    The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach

---

[14] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/

and the exposure of the PII of, upon information and belief, thousands to tens of thousands of individuals, including that of Plaintiff and Class Members.

### *Defendant Acquires, Collects, And Stores Plaintiff's and Class Members' PII*

45.    Defendant acquires, collects, and stores a massive amount of PII on its customers, former customers, and other personnel.

46.    As a condition of obtaining home loans, mortgages, or other services at Sage, Defendant requires that customers personnel entrust it with highly sensitive personal information.

47.    By obtaining, collecting, and using Plaintiff's and Class Members' PII, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class Members' PII from disclosure.

48.    Plaintiff and the Class Members have taken reasonable steps to maintain the confidentiality of their PII and would not have entrusted it to Defendant absent a promise to safeguard that information.

49.    Upon information and belief, in the course of collecting PII from customers, including Plaintiff, Defendant promised to provide confidentiality and adequate security for their data through its applicable privacy policy and through other disclosures in compliance with statutory privacy requirements.

50.    Indeed, Defendant provides on its website that:

We take the protection of your data very seriously.

We use best practices to help keep your data safe.[15]

---

[15] https://www.sagehomeloans.com/privacy

51.    Plaintiff and the Class Members relied on Defendant to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

**_Defendant Knew, Or Should Have Known, of the Risk Because Mortgage Companies In Possession Of PII Are Particularly Susceptible To Cyber Attacks_**

52.    Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting mortgage companies that collect and store PII, like Defendant, preceding the date of the breach.

53.    Data breaches, including those perpetrated against mortgage companies that store PII in their systems, have become widespread.

54.    In the third quarter of the 2023 fiscal year alone, 7333 organizations experienced data breaches, resulting in 66,658,764 individuals' personal information being compromised.[16]

55.    In light of recent high profile data breaches at other industry leading companies, including, Microsoft (250 million records, December 2019), Wattpad (268 million records, June 2020), Facebook (267 million users, April 2020), Estee Lauder (440 million records, January 2020), Whisper (900 million records, March 2020), and Advanced Info Service (8.3 billion records, May 2020), Defendant knew or should have known that the PII that they collected and maintained would be targeted by cybercriminals.

56.    Indeed, cyber-attacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report

---

[16] *See* https://www.idtheftcenter.org/publication/q3-data-breach-2023-analysis/

explained, smaller entities that store PII are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[17]

57.    Additionally, as companies became more dependent on computer systems to run their business,[18] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[19]

58.    Defendant knew and understood unprotected or exposed PII in the custody of mortgage companies, like Defendant, is valuable and highly sought after by nefarious third parties seeking to illegally monetize that PII through unauthorized access.

59.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

60.    Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

---

[17]    https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotection
[18] https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html
[19]    https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022

61.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

62.    The ramifications of Defendant's failure to keep secure the PII of Plaintiff and Class Members are long lasting and severe. Once PII is stolen—particularly Social Security numbers—fraudulent use of that information and damage to victims may continue for years.

63.    In the Notice Letter, Defendant makes an offer of 24 months of identity monitoring services. This is wholly inadequate to compensate Plaintiff and Class Members as it fails to provide for the fact victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft, financial fraud, and it entirely fails to provide sufficient compensation for the unauthorized release and disclosure of Plaintiff's and Class Members' PII.

64.    Defendant's offer of credit and identity monitoring establishes that Plaintiff's and Class Members' sensitive PII was in fact affected, accessed, compromised, and exfiltrated from Defendant's computer systems.

65.    As a mortgage company in custody of the PII of its customers, Defendant knew, or should have known, the importance of safeguarding PII entrusted to it by Plaintiff and Class Members, and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiff and Class Members as a result of a breach. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach.

***Value Of Personally Identifying Information***

66.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[20]

---

[20] 17 C.F.R. § 248.201 (2013).

The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[21]

67.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[22]

68.     For example, Personal Information can be sold at a price ranging from $40 to $200.[23] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[24]

69.     Moreover, Social Security numbers are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as experienced by Plaintiff and some Class Members, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone

---

[21] *Id.*

[22] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/

[23] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/

[24] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

illegally using your Social Security number and assuming your identity can cause a lot of problems.[25]

70.    What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

71.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[26]

72.    Driver's license numbers, which were compromised in the Data Breach, are incredibly valuable.  "Hackers harvest license numbers because they're a very valuable piece of information."[27]

73.    A driver's license can be a critical part of a fraudulent, synthetic identity – which go for about $1200 on the Dark Web.  On its own, a forged license can sell for around $200."[28]

74.    According to national credit bureau Experian:

A driver's license is an identity thief's paradise. With that one card, someone knows your birthdate, address, and even your height, eye color, and signature. If someone gets your

---

[25] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf
[26] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft
[27] *Hackers Stole Customers' License Numbers From Geico In Months-Long Breach*, Forbes, Apr. 20, 2021, *available at:* https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-customers-license-numbers-from-geico-in-months-long-breach/?sh=3bda585e8658
[28]        https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-customers-license-numbers-from-geico-in-months-long-breach/?sh=3e4755c38658

driver's license number, it is also concerning because it's connected to your vehicle registration and insurance policies, as well as records on file with the Department of Motor Vehicles, place of employment (that keep a copy of your driver's license on file), doctor's office, government agencies, and other entities. Having access to that one number can provide an identity thief with several pieces of information they want to know about you. Next to your Social Security number, your driver's license number is one of the most important pieces of information to keep safe from thieves.

75.    According to cybersecurity specialty publication CPO Magazine, "[t]o those unfamiliar with the world of fraud, driver's license numbers might seem like a relatively harmless piece of information to lose if it happens in isolation."[29] However, this is not the case.  As cybersecurity experts point out:

> "It's a gold mine for hackers. With a driver's license number, bad actors can manufacture fake IDs, slotting in the number for any form that requires ID verification, or use the information to craft curated social engineering phishing attacks."[30]

76.    Victims of driver's license number theft also often suffer unemployment benefit fraud, as described in a recent New York Times article.[31]

77.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—Social Security numbers, dates of birth, and names.

78.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information,

---

[29]        https://www.cpomagazine.com/cyber-security/geico-data-breach-leaks-drivers-license-numbers-advises-customers-to-watch-out-for-fraudulent-unemployment-claims/
[30] *Id.*
[31] *How Identity Thieves Took My Wife for a Ride,* NY Times, April 27, 2021, available at: https://www.nytimes.com/2021/04/27/your-money/identity-theft-auto-insurance.html

personally identifiable information and Social Security numbers are worth more than 10x on the black market."[32]

79.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

80.    The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[33]

81.    Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

***Defendant Fails To Comply With FTC Guidelines***

82.    The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

---

[32] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html
[33] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf

83.    In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal consumer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[34]

84.    The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[35]

85.    The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

86.    The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

---

[34] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf
[35] *Id.*

87.     These FTC enforcement actions include actions against mortgage companies, like Defendant.

88.     Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to use reasonable measures to protect PII. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

89.     Defendant failed to properly implement basic data security practices.

90.     Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to the PII of its customers or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

91.     Upon information and belief, Sage was at all times fully aware of its obligation to protect the PII of its customers, Sage was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

***Defendant Fails to Comply with Gramm-Leach-Bliley Act***

92.     Sage is a financial institution, as that term is defined by Section 509(3)(A) of the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6809(3)(A), and thus is subject to the GLBA.

93.     The GLBA defines a financial institution as "any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 [The Bank Holding Company Act of 1956]." 15 U.S.C. § 6809(3)(A).

94.     Defendant collects nonpublic personal information, as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R. § 313.3(n) and 12 C.F.R. § 1016.3(p)(1). Accordingly, during the relevant time period Defendant were subject to the requirements of the GLBA, 15 U.S.C. §§ 6801.1, *et seq.*, and is subject to numerous rules and regulations promulgated on the GLBA statutes.

95.     The GLBA Privacy Rule became effective on July 1, 2001. *See* 16 C.F.R. Part 313. Since the enactment of the Dodd-Frank Act on July 21, 2010, the CFPB became responsible for implementing the Privacy Rule. In December 2011, the CFPB restated the implementing regulations in an interim final rule that established the Privacy of Consumer Financial Information, Regulation P, 12 C.F.R. § 1016 ("Regulation P"), with the final version becoming effective on October 28, 2014.

96.     Accordingly, Defendant's conduct is governed by the Privacy Rule prior to December 30, 2011 and by Regulation P after that date.

97.     Both the Privacy Rule and Regulation P require financial institutions to provide consumers with an initial and annual privacy notice. These privacy notices must be "clear and conspicuous." 16 C.F.R. §§ 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. "Clear and conspicuous means that a notice is reasonably understandable and designed to call attention to the nature and significance of the information in the notice." 16 C.F.R. § 313.3(b)(1); 12 C.F.R. § 1016.3(b)(1). These privacy notices must "accurately reflect[] [the financial institution's] privacy policies and practices." 16 C.F.R. § 313.4 and 313.5; 12 C.F.R. §§ 1016.4 and 1016.5. They must include specified elements, including the categories of nonpublic personal information the financial institution collects and discloses, the categories of third parties to whom the financial institution discloses the information, and the financial institution's security and confidentiality policies and practices for nonpublic personal information. 16 C.F.R. § 313.6; 12 C.F.R. § 1016.6.

These privacy notices must be provided "so that each consumer can reasonably be expected to receive actual notice." 16 C.F.R. § 313.9; 12 C.F.R. § 1016.9. As alleged herein, Defendant violated the Privacy Rule and Regulation P.

98.    Upon information and belief, Defendant failed to provide annual privacy notices to consumers after the relationship ended, despite retaining these consumers' PII and storing that PII on Defendant's network systems.

99.    Defendant failed to adequately inform their consumers that they were storing and/or sharing, or would store and/or share, the consumers' PII on an insecure platform, accessible to unauthorized parties from the internet, and would do so after the relationship ended.

100.    The Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b), requires financial institutions to protect the security, confidentiality, and integrity of consumer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards, including: (1) designating one or more employees to coordinate the information security program; (2) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of consumer information, and assessing the sufficiency of any safeguards in place to control those risks; (3) designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (4) overseeing service providers and requiring them by contract to protect the security and confidentiality of consumer information; and (5) evaluating and adjusting the information security program in light of the results of testing and monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§ 314.3 and 314.4.

101.    As alleged herein, Defendant violated the Safeguard Rule.

102.    Defendant failed to assess reasonably foreseeable risks to the security, confidentiality, and integrity of consumer information.

103.    Defendant violated the GLBA and its own policies and procedures by sharing the PII of Plaintiff and Class Members with a non-affiliated third party without providing Plaintiff and Class Members (a) an opt-out notice and (b) a reasonable opportunity to opt out of such disclosure.

### *Defendant Fails To Comply With Industry Standards*

104.    As noted above, experts studying cyber security routinely identify mortgage companies in possession of PII as being particularly vulnerable to cyberattacks because of the value of the PII which they collect and maintain.

105.    Several best practices have been identified that, at a minimum, should be implemented by mortgage companies in possession of PII, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Sage failed to follow these industry best practices, including a failure to implement multi-factor authentication.

106.    Other best cybersecurity practices that are standard for mortgage companies include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Sage failed to follow these cybersecurity best practices, including failure to train staff.

107.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

108.    These foregoing frameworks are existing and applicable industry standards for mortgage companies, and upon information and belief, Defendant failed to comply with at least one—or all—of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

### Common Injuries & Damages

109.    As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of PII ending up in the possession of criminals, the risk of identity theft to the Plaintiff and Class Members has materialized and is imminent, and Plaintiff and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

*Data Breaches Increase Victims' Risk Of Identity Theft*

110.    The unencrypted PII of Class Members will end up for sale on the dark web as that is the *modus operandi* of hackers.

111.    Unencrypted PII may also fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and Class Members. Simply put, unauthorized individuals can easily access the PII of Plaintiff and Class Members.

112.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal PII to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

113.    Plaintiff's and Class Members' PII is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiff and Class Members and to profit off their misfortune.

114.    One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[36]

---

[36] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-](https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn/

115.    With "Fullz" packages, cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

116.    The development of "Fullz" packages means here that the stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

117.    The existence and prevalence of "Fullz" packages means that the PII stolen from the data breach can easily be linked to the unregulated data (like insurance information) of Plaintiff and the other Class Members.

118.    Thus, even if certain information (such as insurance information) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

119.    Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

*Loss Of Time To Mitigate Risk Of Identity Theft & Fraud*

120.    As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud.

Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

121.    Thus, due to the actual and imminent risk of identity theft, Defendant, in its Notice Letter instructs Plaintiff and Class Members to take the following measures to protect themselves: "[w]e encourage you to remain vigilant against potential identity theft and fraud by carefully reviewing credit reports and account statements to ensure that all activity is valid."[37]

122.    Plaintiff and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach and signing up for the credit monitoring and identity theft protection services offered by Defendant.

123.    Plaintiff's mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[38]

124.    Plaintiff's mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[39]

---

[37] Notice Letter.
[38] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.
[39] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps

125.    And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[4]

***Diminution of Value of PII***

126.    PII is a valuable property right.[40] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that PII has considerable market value.

127.    Sensitive PII can sell for as much as $363 per record according to the Infosec Institute.[41]

128.    An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[42]

129.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[43,44]

---

[40] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf ("GAO Report").

[41] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[42] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/

[43] https://www.latimes.com/business/story/2019-11-05/column-data-brokers

[44] https://datacoup.com/

130.    Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[45]

131.    As a result of the Data Breach, Plaintiff's and Class Members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class Members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

132.    At all relevant times, Sage knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiff and Class Members, and of the foreseeable consequences that would occur if Defendant's data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiff and Class Members as a result of a breach.

133.    The fraudulent activity resulting from the Data Breach may not come to light for years.

134.    Plaintiff and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

135.    Sage was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to, upon information and belief, thousands to tens of thousands of individuals' detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

---

[45] https://digi.me/what-is-digime/

136.    The injuries to Plaintiff and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class Members.

### *Future Cost of Credit and Identity Theft Monitoring is Reasonable and   Necessary*

137.    Given the type of targeted attack in this case, sophisticated criminal activity, and the type of PII involved, there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the PII for identity theft crimes –*e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

138.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her PII was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

139.    Consequently, Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

140.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach.

### *Loss Of Benefit Of The Bargain*

141.    Furthermore, Defendant's poor data security practices deprived Plaintiff and Class Members of the benefit of their bargain. When agreeing to pay Defendant and/or its agents for a

31

mortgage, home loan, or other service, Plaintiff and other reasonable consumers understood and expected that they were, in part, paying for the service and necessary data security to protect the PII, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiff and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant.

### *Plaintiff Patricia Burnelle's Experience*

142.    Plaintiff Patricia Burnelle is a current Sage customer who obtained a mortgage through Defendant.

143.    As a condition of obtaining a mortgage at Sage, she was required to provide her PII to Defendant, including her name, date of birth, contact information, Social Security number, and other sensitive information.

144.    At the time of the Data Breach—December 5, 2023 through December 19, 2023—Defendant retained Plaintiff's PII in its system.

145.    Plaintiff Burnelle is very careful about sharing her sensitive PII. Plaintiff stores any documents containing her PII in a safe and secure location. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Plaintiff would not have entrusted her PII to Defendant had she known of Defendant's lax data security policies.

146.    Plaintiff Patricia Burnelle received the Notice Letter, by U.S. mail, directly from Defendant, dated February 2, 2024.. According to the Notice Letter, Plaintiff's PII was improperly accessed and obtained by unauthorized third parties, including her name, date of birth, passport number, drivers license number, federal/state identification card number, tax identification number, Social Security and/or financial account information, and other information such as phone number, address, and email address.

147.    As a result of the Data Breach, and at the direction of Defendant's Notice Letter, which instructs Plaintiff to "remain vigilant against potential identity theft and fraud by carefully reviewing credit reports and account statements to ensure that all activity is valid[,]"[46] Plaintiff made reasonable efforts to mitigate the impact of the Data Breach, including researching and verifying the legitimacy of the Data Breach and signing up for the credit monitoring and identity theft protection services offered by Defendant. Plaintiff has spent significant time dealing with the Data Breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

148.    Plaintiff suffered actual injury from having her PII compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to her PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

149.    Plaintiff additionally suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach.

---

[46] Notice Letter.

150. The Data Breach has caused Plaintiff to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

151. As a result of the Data Breach, Plaintiff anticipates spending considerable time and money on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

152. As a result of the Data Breach, Plaintiff is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

153. Plaintiff Patricia Burnelle has a continuing interest in ensuring that her PII, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ALLEGATIONS

154. Plaintiff brings this nationwide class action on behalf of herself and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

155. The Class that Plaintiff seeks to represent is defined as follows:

**Nationwide Class**
All individuals residing in the United States whose PII was accessed and/or acquired by an unauthorized party as a result of the data breach reported by Defendant in February 2024 (the "Class").

156. Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers and directors, and any entity in which Defendant have a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

157.    Plaintiff reserves the right to amend the definitions of the Class or add a Class or Subclass if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

158.    <u>Numerosity</u>: The members of the Class are so numerous that joinder of all members is impracticable, if not completely impossible. The Members of the Class are so numerous that joinder of all of them is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time and exclusively in the possession of Defendant, upon information and belief, thousands of individuals were impacted in Data Breach.

159.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class that predominate over questions which may affect individual Class members, including the following:

a.    Whether and to what extent Defendant had a duty to protect the PII of Plaintiff and Class Members;

b.    Whether Defendant had respective duties not to disclose the PII of Plaintiff and Class Members to unauthorized third parties;

c.    Whether Defendant had respective duties not to use the PII of Plaintiff and Class Members for non-business purposes;

d.    Whether Defendant failed to adequately safeguard the PII of Plaintiff and Class Members;

e.    Whether and when Defendant actually learned of the Data Breach;

f.    Whether Defendant adequately, promptly, and accurately informed Plaintiff and Class Members that their PII had been compromised;

g.   Whether Defendant violated the law by failing to promptly notify Plaintiff and Class Members that their PII had been compromised;

h.   Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

i.   Whether Defendant adequately addressed and fixed the vulnerabilities which permitted the Data Breach to occur;

j.   Whether Plaintiff and Class Members are entitled to actual damages, statutory damages, and/or nominal damages as a result of Defendant's wrongful conduct;

k.   Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

160.   Typicality: Plaintiff's claims are typical of those of the other members of the Class because Plaintiff, like every other Class Member, was exposed to virtually identical conduct and now suffers from the same violations of the law as each other member of the Class.

161.   Policies Generally Applicable to the Class: This class action is also appropriate for certification because Defendant acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly and Plaintiff's challenges of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

162.   Adequacy: Plaintiff will fairly and adequately represent and protect the interests of the Class Members in that he has no disabling conflicts of interest that would be antagonistic to

those of the other Class Members. Plaintiff seeks no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages he has suffered are typical of other Class Members. Plaintiff has retained counsel experienced in complex class action and data breach litigation, and Plaintiff intend to prosecute this action vigorously.

163.    <u>Superiority and Manageability:</u> The class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

164.    The nature of this action and the nature of laws available to Plaintiff and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiff and Class Members for the wrongs alleged because Defendant would necessarily gain an unconscionable advantage since they would be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources; the costs of individual suits could unreasonably consume the amounts that would be recovered; proof of a common course of conduct to which Plaintiff was exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause

of action alleged; and individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

165.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrates that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

166.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

167.    Unless a Class-wide injunction is issued, Defendant may continue in its failure to properly secure the PII of Class Members, Defendant may continue to refuse to provide proper notification to Class Members regarding the Data Breach, and Defendant may continue to act unlawfully as set forth in this Complaint.

168.    Further, Defendant has acted on grounds that apply generally to the Class as a whole, so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class- wide basis.

169.    Likewise, particular issues under Rule 42(d)(1) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

      a.  Whether Defendant failed to timely notify the Plaintiff and the class of the Data Breach;

      b.  Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their PII;

c.  Whether Defendant's security measures to protect their data systems were reasonable in light of best practices recommended by data security experts;

d.  Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

e.  Whether Defendant failed to take commercially reasonable steps to safeguard consumer PII; and Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

## CAUSES OF ACTION

### COUNT I
### Negligence
### (On Behalf of Plaintiff and the Class)

170.  Plaintiff re-alleges and incorporates by reference all the allegations contained in paragraphs 1 through 169, as if fully set forth herein.

171.  Defendant requires its customers, including Plaintiff and Class Members, to submit non-public PII in the ordinary course of providing its mortgage and loan services.

172.  Defendant gathered and stored the PII of Plaintiff and Class Members as part of its business of soliciting its services to its customers, which solicitations and services affect commerce.

173.  Plaintiff and Class Members entrusted Defendant with their PII with the understanding that Defendant would safeguard their information.

174.  Defendant had full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and Class Members could and would suffer if the PII were wrongfully disclosed.

175.    By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard their computer property—and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which they could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

176.    Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

177.    Defendant's duty to use reasonable security measures also arose under the GLBA, under which they were required to protect the security, confidentiality, and integrity of consumer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards.

178.    Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks adequately protected the PII.

179.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Sage and Plaintiff and Class Members. That special relationship arose because Plaintiff and the Class entrusted Sage with their confidential PII, a necessary part of being customers at Defendant.

180.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential PII.

181.    Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiff or the Class.

182.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove former customers' PII it was no longer required to retain pursuant to regulations.

183.    Moreover, Defendant had a duty to promptly and adequately notify Plaintiff and the Class of the Data Breach.

184.    Defendant had and continues to have a duty to adequately disclose that the PII of Plaintiff and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiff and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

185.    Defendant breached its duties, pursuant to the FTC Act, GLBA, and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Class Members' PII. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

    a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

    b.  Failing to adequately monitor the security of their networks and systems;

    c.  Allowing unauthorized access to Class Members' PII;

d.  Failing to detect in a timely manner that Class Members' PII had been compromised;

e.  Failing to remove former customers' PII it was no longer required to retain pursuant to regulations,

f.  Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and

g.  Failing to secure its stand-alone personal computers, such as the reception desk computers, even after discovery of the data breach.

186.    Defendant violated Section 5 of the FTC Act and GLBA by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiff and the Class.

187.    Plaintiff and Class Members were within the class of persons the Federal Trade Commission Act and GLBA were intended to protect and the type of harm that resulted from the Data Breach was the type of harm these statues were intended to guard against.

188.    Defendant's violation of Section 5 of the FTC Act and GLBA constitutes negligence.

189.    The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiff and the Class.

190.    A breach of security, unauthorized access, and resulting injury to Plaintiff and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

191.    It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the mortgage industry.

192.    Defendant has full knowledge of the sensitivity of the PII and the types of harm that Plaintiff and the Class could and would suffer if the PII were wrongfully disclosed.

193.    Plaintiff and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the PII of Plaintiff and the Class, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on Defendant's systems or transmitted through third party systems.

194.    It was therefore foreseeable that the failure to adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

195.    Plaintiff and the Class had no ability to protect their PII that was in, and possibly remains in, Defendant's possession.

196.    Defendant was in a position to protect against the harm suffered by Plaintiff and the Class as a result of the Data Breach.

197.    Defendant's duty extended to protecting Plaintiff and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place

to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

198.    Defendant has admitted that the PII of Plaintiff and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

199.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the PII of Plaintiff and the Class would not have been compromised.

200.    There is a close causal connection between Defendant's failure to implement security measures to protect the PII of Plaintiff and the Class and the harm, or risk of imminent harm, suffered by Plaintiff and the Class. The PII of Plaintiff and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

201.    As a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

202.    Additionally, as a direct and proximate result of Defendant's negligence, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their PII, which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

203.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

204.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

## COUNT II
### Negligence *Per Se*
### (On Behalf of Plaintiff and the Class)

205.    Plaintiff re-alleges and incorporates by reference all the allegations contained in paragraphs 1 through 169, as if fully set forth herein.

206.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by Defendant of failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Defendant's duty.

207.    Defendant's duty to use reasonable security measures also arose under the GLBA, under which they were required to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards.

45

208.   As a mortgage company in possession of the sensitive PII of its current and former customers, Defendant owed a duty of care in protecting Plaintiff's and Class Members' PII, pursuant to Section 5 of the FTC Act, GLBA, and an independent duty of care.

209.   Defendant violated Section 5 of the FTC Act, GLBA, and similar state statutes by failing to use reasonable measures to protect PII and not complying with industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII obtained and stored and the foreseeable consequences of a data breach on Defendant's systems.

210.   Defendant violated Section 5 of the FTC Act and GLBA by breaching its duties of care to Plaintiff and Class Members, as provided in its Privacy Policy.

211.   Defendant's violation of Section 5 of the FTC Act, GLBA, and other duties (listed above) constitutes negligence *per se.*

212.   Class members are consumers within the class of persons Section 5 of the FTC Act, GLBA, and similar state statutes were intended to protect.

213.   Moreover, the harm that has occurred is the type of harm the FTC Act, GLBA, and similar state statutes were intended to guard against.

214.   Indeed, the FTC has pursued over fifty enforcement actions against financial institutions which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class Members.

215.   But for Defendant's wrongful and negligent breach of duties owed to Plaintiff and the Class, the PII of Plaintiff and the Class would not have been compromised.

216.   There is a close causal connection between Defendant's failure to implement or ensure security measures to protect the PII of Plaintiff and the Class and the harm, or risk of

imminent harm, suffered by Plaintiff and the Class. The PII of Plaintiff and the Class was lost and accessed as the proximate result of Defendant's failure to exercise reasonable care in safeguarding such PII by adopting, implementing, and maintaining appropriate security measures.

217.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

218.    As a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

219.    As a direct and proximate result of Defendant's negligence *per se*, the products and/or services that Defendant provided to Plaintiff and Class Members damaged other property, including the value of their PII.

220.    Additionally, as a direct and proximate result of Defendant's negligence *per se*, Plaintiff and the Class have suffered and will suffer the continued risks of exposure of their PII,

which remain in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

221.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

222.    Defendant's negligent conduct is ongoing, in that it still holds the PII of Plaintiff and Class Members in an unsafe and insecure manner.

223.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

<u>**COUNT III**</u>
**Breach Of Implied Contract**
**(On Behalf of Plaintiff and the Class)**

224.    Plaintiff re-alleges and incorporates by reference all the allegations contained in paragraphs 1 through 169, as if fully set forth herein.

225.    Plaintiff and Class Members were required to provide their PII to Defendant as a condition of obtaining a mortgage, home loan, or other service at Defendant.

226.    Plaintiff and the Class entrusted their PII to Defendant. In so doing, Plaintiff and the Class entered into implied contracts with Defendant by which Defendant agreed to safeguard and protect such information, to keep such information secure and confidential, and to timely and accurately notify Plaintiff and the Class if their data had been breached and compromised or stolen.

227.    In entering into such implied contracts, Plaintiff and Class Members reasonably believed and expected that Defendant's data security practices complied with relevant laws and regulations and were consistent with industry standards.

228.    Implicit in the agreement between Plaintiff and Class Members and the Defendant to provide PII, was the latter's obligation to: (a) use such PII for business purposes only, (b) take reasonable steps to safeguard that PII, (c) prevent unauthorized disclosures of the PII, (d) provide Plaintiff and Class Members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII, (e) reasonably safeguard and protect the PII of Plaintiff and Class Members from unauthorized disclosure or uses, (f) retain the PII only under conditions that kept such information secure and confidential.

229.    The mutual understanding and intent of Plaintiff and Class Members on the one hand, and Defendant, on the other, is demonstrated by their conduct and course of dealing.

230.    Defendant solicited, offered, and invited Plaintiff and Class Members to provide their PII as part of Defendant's regular business practices. Plaintiff and Class Members accepted Defendant's offers and provided their PII to Defendant.

231.    In accepting the PII of Plaintiff and Class Members, Defendant understood and agreed that it was required to reasonably safeguard the PII from unauthorized access or disclosure.

232.    On information and belief, at all relevant times Defendant promulgated, adopted, and implemented written privacy policies whereby it expressly promised Plaintiff and Class Members that it would only disclose PII under certain circumstances, none of which relate to the Data Breach.

233.    On information and belief, Defendant further promised to comply with industry standards and to make sure that Plaintiff's and Class Members' PII would remain protected.

234.    Plaintiff and Class Members paid money to Defendant with the reasonable belief and expectation that Defendant would use part of its earnings to obtain adequate data security. Defendant failed to do so.

235.    Plaintiff and Class Members would not have entrusted their PII to Defendant in the absence of the implied contract between them and Defendant to keep their information reasonably secure.

236.    Plaintiff and Class Members would not have entrusted their PII to Defendant in the absence of their implied promise to monitor their computer systems and networks to ensure that it adopted reasonable data security measures.

237.    Plaintiff and Class Members fully and adequately performed their obligations under the implied contracts with Defendant.

238.    Defendant breached the implied contracts it made with Plaintiff and the Class by failing to safeguard and protect their personal information, by failing to delete the information of Plaintiff and the Class once the relationship ended, and by failing to provide accurate notice to them that personal information was compromised as a result of the Data Breach.

239.    As a direct and proximate result of Defendant's breach of the implied contracts, Plaintiff and Class Members sustained damages, as alleged herein, including the loss of the benefit of the bargain.

240.    Plaintiff and Class Members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

241.    Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.*, (i) strengthen its data security systems and monitoring procedures; (ii) submit

to future annual audits of those systems and monitoring procedures; and (iii) immediately provide adequate credit monitoring to all Class Members.

**COUNT IV**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

242.    Plaintiff re-alleges and incorporates by reference all the allegations contained in paragraphs 1 through 169, as if fully set forth herein.

243.    Plaintiff brings this Count in the alternative to the breach of implied contract count above.

244.    Plaintiff and Class Members conferred a monetary benefit on Defendant. Specifically, they paid Defendant and/or its agents for a mortgage, home loan, or other service and in so doing also provided Defendant with their PII. In exchange, Plaintiff and Class Members should have received from Defendant the services that were the subject of the transaction and should have had their PII protected with adequate data security.

245.    Defendant knew that Plaintiff and Class Members conferred a benefit upon it and has accepted and retained that benefit by accepting and retaining the PII entrusted to it. Defendant profited from Plaintiff's retained data and used Plaintiff's and Class Members' PII for business purposes.

246.    Defendant failed to secure Plaintiff's and Class Members' PII and, therefore, did not fully compensate Plaintiff or Class Members for the value that their PII provided.

247.    Defendant acquired the PII through inequitable record retention as it failed to investigate and/or disclose the inadequate data security practices previously alleged.

248.    If Plaintiff and Class Members had known that Defendant would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their PII, they would have entrusted their PII at Defendant or obtained services at Defendant.

249.    Plaintiff and Class Members have no adequate remedy at law.

250.    Under the circumstances, it would be unjust for Defendant to be permitted to retain any of the benefits that Plaintiff and Class Members conferred upon it.

251.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their PII; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the PII.

252.    Plaintiff and Class Members are entitled to full refunds, restitution, and/or damages from Defendant and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Defendant from its wrongful conduct. This can be accomplished by establishing a constructive trust from which the Plaintiff and Class Members may seek restitution or compensation.

253.    Plaintiff and Class Members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of herself and Class Members, requests judgment against Defendant and that the Court grants the following:

A.    For an Order certifying the Class, and appointing Plaintiff and her Counsel to represent the Class;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the PII of Plaintiff and Class Members;

C.    For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members, including but not limited to an order:

i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

ii.    requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii.    requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiff and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

iv.    requiring Defendant to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII for Plaintiff's and Class Members' respective lifetimes;

v.    requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiff and Class Members;

vi.    prohibiting Defendant from maintaining the PII of Plaintiff and Class Members on a cloud-based database;

vii.    requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

viii.    requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

ix.    requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures;

x.    requiring Defendant to segment data by, among other things, creating firewalls and controls so that if one area of Defendant's network is compromised, hackers cannot gain access to portions of Defendant's systems;

xi.    requiring Defendant to conduct regular database scanning and securing checks;

xii.    requiring Defendant to establish an information security training program that

includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personal identifying information, as well as protecting the personal identifying information of Plaintiff and Class Members;

xiii. requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiv. requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xv. requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xvi. requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of their confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect herself;

xvii.   requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

xviii.   for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.      For an award of damages, including actual, nominal, statutory, consequential, and punitive damages, as allowed by law in an amount to be determined;

E.      For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

F.      For prejudgment interest on all amounts awarded; and

G.      Such other and further relief as this Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all claims so triable.

Dated: February 26, 2024                    Respectfully Submitted,

*/s/ Paul J. Doolittle*
Paul J. Doolittle (Fed ID #6012)
Blake G. Abbott (Fed ID #13354)
**POULIN | WILLEY | ANASTOPOULO, LLC**
32 Ann Street
Charleston, SC 29403
Tel: (803) 222-2222
Email: paul.doolittle@poulinwilley.com
     blake.abbott@poulinwilley.com

John J. Nelson*
**MILBERG COLEMAN BRYSON**
**PHILLIPS GROSSMAN, PLLC**

402 W. Broadway, Suite 1760
San Diego, CA 92101
Telephone: (858) 209-6941
Email: jnelson@milberg.com

*Attorneys for Plaintiff and
Proposed Class Counsel*

*\*Pro Hac Vice* application forthcoming